**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| J.S., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CONNECTED VENTURES, LLC,<br><br>Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff J.S. ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Connected Ventures, LLC d/b/a Dropout.tv ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to her, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Defendant Connected Ventures LLC owns and operates Dropout TV, a subscription-based comedy streaming website featuring various skits and shorts. Consumers access the site through their browsers at dropout.tv.

2. Defendant has installed a "tracking pixel" on its website, which hosts the videos for streaming. This tracking pixel surreptitiously sends consumers' viewing activities to third-party providers like Meta Platforms, Inc. ("Meta" or "Facebook") without consent, in violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C § 2710, *et seq.*

3. Congress has recognized that "films are the intellectual vitamins that fuel the growth of individual thought." S. Rep. No. 100-599, at *7 (Oct. 21, 1988) (citing Senate

Judiciary Subcommittee on Technology and Law, Hearing Tr. at 10 (Aug. 3, 1988)). As the Committee on the Judiciary explained when considering the VPPA, "[Privacy] is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom. We want to be left alone." *Id*. at *6. The VPPA was meant to give consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." *Id*. at *8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

4. Specifically, Defendant violated the VPPA by knowingly disclosing the personally identifiable information ("PII") of Plaintiff and the class members to Meta without their consent. To do so, behind the scenes of its videos, Defendant installed computer code on its website called the "Meta Tracking Pixel," which—unbeknownst to Plaintiff and the members of the Class—tracks and records Plaintiff's and the Class Members' private video consumption and discloses it to Meta without their consent. Meta, in turn, uses Plaintiff's and the Class Members' video consumption habits to build profiles on consumers and deliver targeted advertisements to them, among other activities.[1]

**PARTIES**

5. Plaintiff J.S. is a citizen of New York residing in New York City. Plaintiff accessed her paid, dropout.tv account to watch videos as recently as June 2024, in a browser she uses to access her Facebook account which uses her real name.

[1] Notably, the Meta Tracking Pixel works in conjunction with its Conversion API tool and, as a result, Defendant transmits one copy of its digital subscribers' viewing information directly from its web server to Meta's web servers. Additional copies of this information are communicated through the use of cookies.

6. Defendant Connected Ventures LLC is a California limited liability company with its principal place of business at 2012 Hyperion Avenue, Los Angeles, California 90027. Defendant Connected Ventures LLC owns and operates Dropout.tv, which is used throughout New York and the United States.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under a law of the United States (*i.e.,* the VPPA). In addition, this Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the Class and there is minimal diversity.

6. This Court has personal jurisdiction over Defendant because Defendant purposefully availed itself to the benefits of this District by selling subscriptions to its video service in this District. In addition, a substantial portion of the events giving rise to Plaintiff's claims occurred in this District.

7. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial portion of the acts and events giving rise to the claims occurred in this District and Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

### A. The VPPA

8. The origins of the VPPA began with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the conformation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper, which was then published. With an eye toward the digital future, Congress responded by passing the VPPA. As Senator Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, or who some of the people they telephone. I think that is wrong. I think that really is Big Brother and I think it is something that we have to guard against.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

9. Accordingly, the VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

10. As Senator Patrick Leahy explained, the VPPA was particularly concerned with consumers' video transactional data being shared with unauthorized third parties:

> The trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance. These "information pools" create privacy interests that directly affect the ability of people to express their opinions, to join in association with others and to enjoy the freedom and independence that the Constitution was established to safeguard. The bill prohibits video stores from disclosing "personally identifiable information"—information that links the customer or patron to particular materials or services. In the event of an unauthorized disclosure, an individual may bring a civil action for damages.

S. Rep. 100-599, at 5-6 (internal ellipses omitted).

11. The Senate Report for the bill further clarifies "that personally identifiable information is intended to be transaction oriented. It is information that identifies a particular person as having engaged in a specific transaction with a video tape service provider." S. Rep. 100-599, at 12.

**B. The Meta Tracking Pixel**

12. Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[2] Facebook describes itself as a "real identity platform,"[3] meaning users are allowed only one account and are encouraged to share "the name they go by in everyday life."[4] To that end, when creating an account, users provide their first and last name, along with their birthday, gender, and phone number or email address.[5]

13. Meta owns Facebook.com and generates revenue by selling advertising space on its website, and other applications it owns, like Instagram.[6]

---

[2] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO! (July 28, 2021), *available* https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html (last accessed June 21, 2024).

[3] Sam Schechner & Jeff Horowitz, *How Many Users Does Facebook Have? The Company Struggles to Figure it Out*, Wall St. J. (Oct. 21, 2021) *available* https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701 (last accessed June 21, 2024).

[4] META, *Community Standards, Part IV Integrity and Authenticity,* available https://www.facebook.com/communitystandards/integrity_authenticity (last accessed June 21, 2024).

[5] META, *Sign Up*, available https://www.facebook.com/ (last accessed June 21, 2024).

[6] Mike Isaac, *Facebook Profit Surges 101 Percent on Strong Ad Sales,* N.Y. TIMES (July 28, 2021) *available* https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html (last accessed June 21, 2024).

14. Meta sells advertising space by highlighting its ability to target users.[7] Meta can target users effectively because it surveils user activity both on and ***off its site***.[8] This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "location," and "demographics."[9] Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

15. Businesses can also build "Custom Audiences."[11] Custom audiences enable businesses to reach "people who already know [their] business," because Meta can track whether they're loyal customers or people who have used a particular business' app or visited website.[12] Businesses can use Custom Audiences to target existing customers directly, or they can use it to build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behaviors from your source audience to find new people who share similar qualities."[13] Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta. They can do so through two mechanisms: by manually uploading contact information for

---

[7] META, *Why Advertise on Facebook, Instagram and other Meta Technologies*, available https://www.facebook.com/business/help/205029060038706 (last accessed June 21, 2024).

[8] META, *About Meta Pixel*, available https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last accessed June 21, 2024).

[9] META, *Audience Ad Targeting*, available https://www.facebook.com/business/ads/ad-targeting (last accessed June 21, 2024).

[10] META, *Easier, More Effective Ways to Reach the Right People on Facebook*, available https://www.facebook.com/business/news/Core-Audiences (last accessed June 21, 2024).

[11] META, *Create a website custom audience*, available https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last accessed June 21, 2024).

[12] META, *Audience ad targeting*, available https://en-gb.facebook.com/business/ads/ad-targeting (last accessed June 21, 2024).

[13] META, *About Lookalike Audiences*, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last accessed June 21, 2024).

customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[14] One such Business Tool is the Meta Tracking Pixel.

16. The Meta Tracking Pixel is a piece of code that businesses, like Defendant, can integrate into its website. Once activated, the Meta Tracking Pixel "allows [the site] to track visitor activity on [their] website."[15] When the Meta Tracking Pixel captures an action, it sends a record to Facebook. Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

17. Businesses control what actions—or, as Meta calls it, "events"—the Meta Tracking Pixel will collect on that business's site, including the website's metadata, along with what pages a consumer views.[16] Businesses can also configure the Meta Tracking Pixel to track other events. Meta offers a menu of "standard events" from which businesses can choose to track, including what content a consumer views or purchases.[17] An advertiser can also create their own tracking parameters by building a "custom event."[18]

---

[14] META, *Create a Customer List Custom Audience*, available https://www.facebook.com/business/help/170456843145568?id=2469097953376494; *See Also* Meta, *Create a Website Custom Audience*, available https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last accessed June 21, 2024).

[15] META, *Meta Pixel*, available https://developers.facebook.com/docs/meta-pixel/ (last accessed June 21, 2024).

[16] *See* META, *Meta Pixel, Accurate Event Tracking, Advanced*, available https://developers.facebook.com/docs/facebook-pixel/advanced/; *See also* Facebook, *Best Practices for Facebook Pixel Setup,* https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last accessed June 21, 2024).

[17] META, *Specifications for Facebook Pixel Standard Events*, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last accessed June 21, 2024).

[18] META, *About Standard and Custom Website Events*, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last accessed June 21, 2024).

18. Likewise, businesses using the pixel on their website control how the Meta Tracking Pixel identifies consumers. The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[19] The HTTP Headers collect "IP addresses, information about the web browser, page location, document referrer and persons using the website."[20] Pixel-specific Data includes "the Pixel ID and Cookie."[21]

19. The Meta Tracking Pixel, like website cookies generally, attaches to the browser that the user uses to access their Facebook account. That cookie then follows the user's web activity occurring within that same browser. For example, if the user accesses Facebook.com through their Safari browser, then moves to Macys.com after leaving Facebook, the Meta Pixel will continue to track that user's activity on that browser.

**C. Defendant is a Video Tape Service Provider.**

20. Defendant owns and operates Dropout.tv, a video streaming service that features close to 90 pre-recorded, on-demand series for streaming.[22]

21. To access the videos, consumers must create an account and pay for access on a monthly or annual basis.

22. Upon sign in, the consumer is presented with a wall of content, advertising "Dropout Original" shows and new releases:

---

[19] META, *Meta Pixel*, https://developers.facebook.com/docs/facebook-pixel/ (last accessed June 21, 2024).

[20] *Id.*

[21] *Id.*

[22] Dropout.tv, *Series*, available https://www.dropout.tv/browse (last accessed May 28, 2024).







***Figure A.***

23. Defendant describes Dropout as aiming "to connect with comedy fans of all stripes through longform video content on its subscription platform and through shortform video content across social media. With shows like Dimension 20, Game Changer, Very Important People, and Dirty Laundry, Dropout works to create inclusive comedy for everyone."[23]

[23] Dropout.tv, *About Us*, available https://signup.dropout.tv/about/ (last accessed May 28, 2024).

**D. Dropout.tv and the Meta Tracking Pixel**

24. Unbeknownst to Defendant's consumers, Dropout.tv knowingly discloses users' video histories to Meta.

25. The Dropout website hosts the Meta Tracking Pixel which transmits events to Meta. Dropout first generates a PageView event that discloses a webpage's Universal Resource Locator ("URL") containing the video title the consumer has requested and viewed. That information is relayed to Meta as shown in Figures B, C, and D.

26. When a consumer selects a video to watch, the URL populates with the identifying information:




***Figure B.***

27. The titles of the videos are disclosed to Meta, along with the user's Facebook ID, which is located in the c_user cookie.




***Figure C.***

28. The c_user cookie is personally identifiable information because it contains a consumer's unencrypted Facebook ID. A Facebook ID allows *anybody*—not just Facebook—to identify the individual Dropout.tv subscriber with a Facebook account. If one types

www.facebook.com/[facebook ID] into a web browser, it will load the individual's Facebook page.

29. The Meta Tracking Pixel transmits additional cookies to Meta.

30. The fr cookie, active on Defendant's site, contains, at least, an encrypted Facebook ID and browser identifier.[24] Facebook, at a minimum, uses the fr cookie to identify particular users.[25]

**Request Cookies** ☐ show filtered out request cookies

| Name | Value | Domain | Path | Expires / ... | Size | HttpOnly | Secure |
|---|---|---|---|---|---|---|---|
| c_user | [redacted]6883 | .facebook.com | / | 2025-05-2... | 20 | | ✓ |
| datr | OGbfZdjttCdqBIPCApMhwKqL | .facebook.com | / | 2025-04-0... | 28 | ✓ | ✓ |
| fr | 1OATrNdyBgQGQBwBb.AWX6SxXHEU9XO4ZNVasz5vjrlcw.BmTS... | .facebook.com | / | 2024-08-1... | 82 | ✓ | ✓ |
| ps_n | 1 | .facebook.com | / | 2025-05-2... | 5 | ✓ | ✓ |
| sb | ma5vZcdDROgcVHxUJqJLqHWH | .facebook.com | / | 2025-04-1... | 26 | ✓ | ✓ |
| usida | eyJ2ZXliOjEslmlkljoiQXNkdXg0eTF4ZzZvdWEiLCJ0aW1lIjoxNzE2... | .facebook.com | / | Session | 77 | | ✓ |
| xs | 39%3AhoygqNCcDoY9iA%3A2%3A1709833472%3A-1%3A-1%3... | .facebook.com | / | 2025-05-2... | 97 | ✓ | ✓ |

***Figure D.***

31. Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser. Facebook uses this for targeted advertising.

32. The Meta Tracking Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.* dropout.tv.com.[26] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.,* Facebook.[27]

---

[24] DATA PROTECTION COMMISSIONER, Facebook Ireland Ltd, Report of Re-Audit (Sept. 21, 2012), *available* http://www.europe-v-facebook.org/ODPC_Review.pdf

[25] META, Cookies & Other Storage Technologies, https://www.facebook.com/policy/cookies/ (last accessed June 27, 2024).

[26] PC MAG, *First Party Cookie*, available https://www.pcmag.com/encyclopedia/term/first-party-cookie (last accessed June 27, 2024).

[27] PC MAG, *Third Party Cookie*, available https://www.pcmag.com/encyclopedia/term/third-party-cookie (last accessed June 27, 204).

33. Meta, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

34. Through the Meta Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, what Dropout.tv consumers are requesting and watching for entertainment.

35. By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data for videos, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

## CLASS ALLEGATIONS

38. **Nationwide Class.** Plaintiff seeks to represent a class of similarly situated individuals defined as follows:

> All persons in the United States who have a Facebook account, have a Dropout.tv subscription, and watch Dropout.tv videos on the Dropout.tv website using the same browser the person uses to access their Facebook account.

39. Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate.

40. Excluded from the Class are Defendant's past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case, their immediate families, Plaintiff's counsel and Defendant's counsel.

41. **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiff does not know the exact number of members of the Class. However, given the popularity of Defendant's website, the number of persons in the Class is believed to be so numerous that joinder of all members is impracticable.

42. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

(a) Whether Defendant collected Plaintiff's and the Class Members' PII;

(b) Whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;

(c) Whether Defendant's disclosures were committed knowingly and intentionally;

(d) Whether Defendant disclosed Plaintiff's and the Class Members' PII without consent.

43. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used Dropout.tv to request and watch videos, and had her PII and video-identifying data disclosed by Defendant to a third party without her consent.

44. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation. Plaintiff and her counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiff nor her counsel have any interest adverse to, or in conflict with, the interest of the absent members of the Class. Plaintiff has raised variable statutory claims of the type reasonably expected to be raised by members of the Class and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class (or to address additional Classes), additional claims as may be appropriate, or to amend the definition of the Class to address steps that Defendant took.

45. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Even if every member of the Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the court in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system, resulting in multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action.

**COUNT I**
**Violation of the Video Privacy Protection Act**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of the Class)**

46. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

47. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

48. Defendant is a "video tape service provider" because it creates, hosts, and delivers dozens of videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4). In particular, Defendant provides a library of audiovisual material to consumers for a monthly fee.

49. Plaintiff and members of the Class are "consumers" because they have accounts with Dropout.tv and pay a monthly fee to access and watch Defendant's videos. *See* 18 U.S.C. § 2710(a)(1).

50. Defendant disclosed to a third party, Meta, Plaintiff's and the members of the Class Members' personally identifiable information. Defendant installed the Meta Tracking Pixel on its website to compel Plaintiff's browsers to transfer their personally identifying information in the form of their Facebook ID, along with event data like the title of the video they viewed, to Meta.

51. Plaintiff and the members of the Class viewed and accessed the videos using their Dropout.tv accounts.

52. Defendant knowingly disclosed Plaintiff's PII because it installed the Meta Tracking Pixel on its website and controlled its functionality.

53. Plaintiff and the members of the Class did not provide Defendant with adequate consent—either written or otherwise—to disclose their PII and event data to third parties.

54. Nor were Defendant's disclosures made in the "ordinary course of business" as the terms is defined by the VPPA. Specifically, Defendant's disclosures to Meta were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

55. On behalf of herself and the members of the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of the Plaintiff and the Class by requiring Defendant comply with the VPPA's requirement for protecting a consumer's PII; (3) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (4) reasonable attorneys' fees and costs and other litigation expenses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgement against Defendant as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Class and naming Plaintiff's attorney as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violated the statute referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For an award of statutory damages to the extent available;

(e) For punitive damages, as warranted in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper;

(h) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: July 1, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Neal J. Deckant*
Neal J. Deckant

Neal J. Deckant
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ndeckant@bursor.com

*Attorney for Plaintiff*